# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ARTURO HERNANDEZ,**
          **Petitioner,**

    **v.**                                         **Case No. 07C0417**

**PAM WALLACE,**
          **Respondent.**

---

## DECISION AND ORDER

Petitioner Arturo Hernandez, a Wisconsin state prisoner, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction after a jury trial of one count of delivery of a controlled substance as party to the crime. Petitioner alleges that his trial counsel was ineffective (1) for failing to object to a defective jury instruction concerning party to a crime; (2) for failing to object to the undercover officer's speculative testimony suggesting that petitioner negotiated the sale of a "kilo"; and (3) for failing to obtain prior to trial a copy of the body-wire tape of petitioner's conversation with the undercover officer. Petitioner appealed his conviction, and the state court of appeals affirmed. The state supreme court denied review.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 15, 2004, following a jury trial, petitioner was convicted of one count of delivery of a controlled substance as party to the crime. See Wis. Stat. §§ 961.41(1) & 939.05. The jury found that the controlled substance was cocaine and that the amount delivered was more than 40 grams, thus subjecting petitioner to the penalties found in Wis. Stat. § 961.41(1)(cm)4. Petitioner's arrest and conviction resulted from an undercover

operation by the Milwaukee Metropolitan Drug Enforcement Group, in which an undercover officer, Willie Huerta, posed as a potential purchaser of a kilogram ("kilo") of cocaine.[1] Various suspects allegedly participated in the transaction that resulted in the sale of a kilo to the undercover officer, including petitioner, Erika Rodriguez and Juan Carlos Angulo, with Rodriguez physically delivering the kilo to Huerta. The state court of appeals summarized the details of the case as follows:

> At trial Willie Huerta, an undercover officer for the Milwaukee Metropolitan Drug Enforcement Group, testified that on March 27, 2003, he parked his car in the parking lot of a grocery store located on the south side of Milwaukee as a result of a prearranged meeting with Juan Carlos Angulo and Erika Rodriguez, for the purchase of a kilo of cocaine. Upon arriving in the parking lot, Huerta saw Angulo and Rodriguez sitting in the front seat of a Ford truck. Huerta parked, and Angulo got out of the car and entered Huerta's car and told Huerta that the cocaine was coming. Some time later, Angulo said his supplier was "on the lot," or words to that effect, and Huerta then saw a man, later identified as Hernandez, get out of a Mazda automobile and approach the truck occupied by Rodriguez. Rodriguez got out of the truck and she and Hernandez had a brief conversation. Then both Rodriguez and Hernandez approached Huerta's car, and Angulo got out of the car. Rodriguez got in the backseat and Hernandez got in the front passenger's seat.

> During a conversation between Hernandez and Huerta which was recorded by the officer and later played to the jury, Hernandez said something along the lines of, "This is the stuff you are going to get," and Hernandez handed Huerta a five-dollar bill that contained cocaine. Huerta asked whether the cocaine was good for cooking into crack cocaine, and Hernandez responded that it was pure and good for cooking. Huerta said the sample was acceptable and Hernandez exited the car. While standing outside the car, Hernandez said to Huerta, "You can call me next time," or words to that effect.

> The conversation was partly in English and partly in Spanish. Huerta testified that after they talked in the car, Hernandez then went to the Ford truck and had a brief conversation with Rodriguez. Meanwhile, Angulo got

---

[1]In the present case, the kilo was also referred to as a "two-six," which is drug parlance representing the fact that the officer was to pay $26,000 for the kilo.

into Huerta's car. Hernandez left in the Mazda and Rodriguez went and sat in the truck for about twenty minutes. Huerta saw Rodriguez talking on her cell phone and then she drove off.

While sitting in the car, Huerta received a phone call from Rodriguez. She asked to change the location of the purchase because the person she was getting the kilo from did not feel comfortable in that location. Huerta refused to change the location of the transfer. The phone call ended and Huerta received a second phone call from Rodriguez, who instructed Huerta to go to the trunk of his car and get the money. She said she would be in a different vehicle when she returned. Huerta then saw the Mazda but could not see the occupants. Huerta also saw the Ford truck, now being driven by Hernandez, drive by. Shortly thereafter, Huerta saw Rodriguez in the parking lot, and while he retrieved the bag of money from the trunk, Rodriguez jogged towards him with a white bag. Rodriguez handed Huerta the bag and Huerta saw what he believed to be a brick of cocaine, which later testing confirmed. Huerta then gave a signal, and Rodriguez, Angulo and the driver of the Mazda, Sergio Herrera-Alvarez, were arrested. Hernandez was not present when the others were arrested.

After the arrests Hernandez, along with the other three, was charged. A warrant was issued for Hernandez's arrest and he was arrested several months later. Hernandez, who was born in Mexico and had been in the United States for approximately six years, claimed at trial that he did not read or write English, although he did speak some English. After he was arrested, Hernandez was interviewed by Huerta, who took his statement and wrote it in English. Huerta then read it back to Hernandez in English.

At the trial, Huerta testified to the contents of the statement given by Hernandez at the time of his arrest, in which Hernandez stated that his friend Rodriguez had asked him to sell her a kilo of cocaine and he told her that he could not get a kilo and Rodriguez then agreed to buy one ounce of cocaine. Hernandez admitted getting into Huerta's car and handing him a five-dollar bill that contained cocaine and he admitted that he told Huerta that the cocaine would be good for cooking. Hernandez claimed he had sold drugs before, but never in big quantities. He said: "I don't know why I was selling that [expletive], I was just partying. I don't need that. I was making good money with selling cars...."

In his statement, Hernandez told the officer that when the officer mentioned a price of "26," he was shocked because he had not agreed to sell a kilo of cocaine and, as proof of this, he claimed Rodriguez immediately interrupted and told Huerta that the deal was between Huerta and her. Hernandez stated that he then got out of the car and told Rodriguez that he could not get her a kilo of cocaine and Rodriguez said she would get it from

3

somebody else. In his statement, Hernandez said he then drove away and went to his brother's house where Rodriguez called him and asked him to meet her. Hernandez thought that Rodriguez was going to give him $700 to purchase an ounce of cocaine, so he agreed to meet her. After Rodriguez arrived at the gas station where he was told to go, he got into Rodriguez's truck. Rodriguez explained to him that she did not have the money. Hernandez asked to be taken home, and they passed co-defendant Sergio Herrera-Alvarez, who was sitting in a car. Rodriguez asked Hernandez to tell Herrera-Alvarez to meet her at 35th and Burnham. Hernandez explained in his statement to Huerta that he did not want any part of the deal to sell a kilo of cocaine because "he knew in his heart that Erika was going to sell the officer a kilo of cocaine." He said that although he agreed to drive Rodriguez, he became nervous and told Rodriguez he did not want to be in the middle of her business and he dropped her off at home. He claimed that Rodriguez then exited her truck and took a white bag that was on the floor. Before getting out of the car, Rodriguez called Herrera-Alvarez, who agreed to give Rodriguez and Angulo a ride home after the deal. Hernandez told the officer that he then drove Rodriguez's truck to her home and left it and the keys. At the trial, on cross-examination, Huerta admitted that Hernandez never used the word "kilo" during the conversation, and when Huerta brought up the price of "26" (which he explained was drug slang for $26,000), that Rodriguez jumped into the conversation and "basically stopped me from talking to Hernandez," and that Hernandez said to him, "you and me nothing."

Hernandez also testified at the trial with the help of an interpreter. Hernandez's defense was that he took no part in Rodriguez's plan to sell a kilo, but he was guilty of possessing the cocaine in the five-dollar bill. Hernandez testified that Rodriguez had called him and told him to meet her at the grocery store parking lot. When he arrived, Huerta was outside the car and Hernandez introduced himself. Hernandez, Rodriguez, Angulo, and Huerta then got into Huerta's car, at which time Hernandez admitted giving Huerta a five-dollar bill with cocaine in it. He claimed that Rodriguez had asked him to get it. He denied being part of the plan to sell a kilo of cocaine and said he had never been involved in dealing large amounts of drugs. He maintained that there was never a conversation between Rodriguez and him to buy a kilo. He also explained that when he said "call me later" after exiting Huerta's car (a comment heard on the tape), he was not talking to Huerta; rather, the comment was addressed to Rodriguez.

On cross-examination, Hernandez admitted that he knew the cocaine in the five-dollar bill was not good for "cooking," contrary to what he told Huerta in the car, because it was cut with baking soda. With respect to the potential purchase of an ounce of cocaine, Hernandez stated that he had not planned to sell Rodriguez any cocaine; rather, he was going to take

4

> Rodriguez to a bar where she could purchase an ounce of cocaine. Although Hernandez admitted that he initialed the statement written by Huerta, he claimed not to read or write English, and he stated he did not know whether what was read back to him was what was written on the document.

(Answer Ex. I at 2-7.)

At trial, petitioner's defense was that he did not intend to aid and abet Rodriguez in her delivery of any amount of cocaine to Huerta. Rather, petitioner maintained that he intended to conduct his own sale of an ounce of cocaine or less.[2] The prosecution, however, sought to prove that petitioner aided and abetted Rodriguez's delivery of a kilo of cocaine to Huerta. To accommodate the parties' theories, the trial judge submitted three verdicts to the jury. The first verdict asked whether petitioner was guilty of aiding and abetting Rodriguez in her delivery of more than 40 grams of cocaine to Huerta. The second asked whether petitioner was guilty of delivering less than one gram of cocaine to the officer. The third verdict was not guilty. The judge submitted the second verdict because, even if the jury found that petitioner did not intend to aid and abet Rodriguez, he was still guilty of delivering the sample of cocaine wrapped in the five-dollar bill.[3]

The trial court instructed the jury as follows:

_____

[2]In this court, petitioner's lawyer asserts that petitioner's trial defense was that although he intended to aid and abet Rodriguez, he only intended to help her deliver an ounce of cocaine, not a kilo. However, based on my reading of trial counsel's opening and closing statements, petitioner's trial strategy was to deny that petitioner had any intent to help Rodriguez sell any drugs. Instead, petitioner wanted the jury to believe that he intended to sell an ounce to either Huerta or Rodriguez on his own, and that he had no idea that Rodriguez intended to engage in a separate transaction with Huerta.

[3]Petitioner essentially admitted at trial that he delivered some small amount of cocaine to Huerta in the five-dollar bill. (Answer Ex. 67 at 50 (closing argument of petitioner's counsel).) Thus, the only practical verdicts were guilty on the aiding and abetting charge, or guilty of directly committing the crime of delivery with respect to the gram or less.

5

Now, the information in this case charges that on March 27, 2003 at 3524 West Burnham Street, City of Milwaukee, as a party to a crime, the defendant did knowingly deliver more than 40 grams of cocaine, a controlled substance contrary to Wisconsin Statutes section 961.16 (2) (b) (1) and 961.41 (1) (cm) (4) and 939.05.

To this charge, the defendant has entered a plea of not guilty which means the State must prove every element of the offense charge [sic] beyond a reasonable doubt.

Now, party to a crime: Aiding and Abetting: Defendant intentionally aided the crime charged. Section 939.05 of the Criminal Code of Wisconsin provides that whoever is concerned in the commission of a crime is a party to the crime and may be convicted of that crime although the person did not directly commit it.

The State contends that the defendant was concerned in the commission of the crime of delivery of cocaine more than 40 grams, by intentionally aiding and abetting the person who directly committed it. If a person intentionally aids and abets the commission of a crime, then that person is guilty of the crime as well as the person who directly committed it.

Definition of aiding and abetting. A person intentionally aids and abets the commission of a crime when acting with knowledge or belief that another person is committing or intends to commit a crime, he knowingly either assists the person who commits the crime or is ready and willing to assist the person who commits the crime and the person who commits the crime knows of the willingness to assist.

To intentionally aid and abet the defendant must know that another person is committing or intends to commit the crime of delivery of cocaine and have the purpose to assist the commission of that crime.

However, a person does not aid and abet if he's only a bystander or spectator and does nothing to assist the commission of a crime.

Before you may find the defendant guilty, the State must prove by evidence which satisfies you beyond a reasonable doubt that the crime of delivery of cocaine was committed and that the defendant intentionally aided and abetted the commission of that crime.

Now, statutory definition of the crime. Delivery of cocaine is charged in 961.41 (1) of the Criminal Code of Wisconsin is committed by one who delivers a substance, when the substance was cocaine, and the person

6

knew or believed that the substance was cocaine.

The State must prove by evidence which satisfies you beyond a reasonable doubt that the following three elements of delivery of cocaine were present:

Elements of the crime the State must prove:

The first element requires that Erika Rodriguez delivered a substance. Deliver means to transfer or attempt to transfer something from one person to another. The second element requires that the substance was cocaine. The third element requires that Erika Rodriguez knew or believed that the substance was cocaine, a controlled substance. A controlled substance is a substance, the delivery of which is prohibited by law.

Now, you cannot look into a person's mind to determine knowledge or belief. Knowledge or belief must be found, if found at all, from any acts, words and statements and from all the facts and circumstances in this case bearing on knowledge and belief.

If you are satisfied beyond a reasonable doubt that Erika Rodriguez committed all three elements of delivery of cocaine and the defendant intentionally aided and abetted the commission of that crime, you should find the defendant guilty.

If you are not so satisfied, you must find the defendant not guilty of delivery of cocaine of more than 40 grams as party to the crime, and you should consider whether the defendant is guilty of delivery of cocaine less than one gram, in violation of section 961.41 (1) (cm) of the Criminal Code of Wisconsin.

You should make every reasonable effort to agree unanimously on your verdict on the charge of delivery of cocaine more than 40 grams, as a party to the crime, the offense charged in the information, before considering the alternative of delivery of cocaine less than one gram. However, if after full and complete consideration of the evidence, you conclude that further deliberation would not result in unanimous agreement on the charge of delivery of cocaine more than 40 grams, as a party to the crime, you should consider whether the defendant is guilty of delivery of cocaine one gram or less.

The difference between delivery of cocaine, more than 40 grams, as party to the crime, the offense charged in the information, and delivery of cocaine is that the crime charged in the information requires one additional

7

fact to be found: that the amount of cocaine that the defendant was party to the crime of delivering was more than 40 grams and the defendant was party to the crime of delivering it.

If you are satisfied beyond a reasonable doubt that all of the elements of the crime of delivery of cocaine were committed by the defendant, except that the amount of cocaine delivered was one gram or less, you should find the defendant guilty of delivery of cocaine one gram or less.

(Answer Ex. 68 at 13-17.)

As indicated, the trial court submitted the following verdict forms:

One reading: We, the jury, find the defendant, Arturo Hernandez, guilty of delivery of cocaine, more than 40 grams, as a party to the crime, as charged in the information.

Another reading: We, the jury, find the defendant, Arturo Hernandez, guilty of delivery of cocaine less than one gram, at the time and place charged in the information.

And the third reading: We, the jury, find the defendant, Arturo Hernandez, not guilty.

(Answer Ex.67 at 57.) The jury found the defendant guilty of delivery of cocaine, more than 40 grams, as party to the crime.

## II. APPLICABLE LEGAL STANDARDS

I may grant petitioner's application for a writ only if the decision of the state court of appeals on the merits of the petitioner's federal claims (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court, 28 U.S.C. § 2254(d)(1); or (2) was based on an unreasonable determination of the facts in light of the evidence presented, 28 U.S.C. § 2254(d)(2). See Wiggens v. Smith, 539 U.S. 510, 520 (2003). To establish that his lawyer was ineffective, petitioner must show that the lawyer performed deficiently and that he suffered prejudice

8

as a result. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-94 (1984). To establish deficient performance, petitioner must demonstrate that his lawyer's representation fell below an objective standard of reasonableness as measured by prevailing professional norms. <u>Id.</u> at 687. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Id.</u> To establish prejudice, petitioner must show that there is a reasonable probability that but for his lawyer's deficient performance, the result of the proceeding would have been different. <u>Id.</u> at 694. In the present case, petitioner argues that in denying his claims of ineffective assistance, the state court of appeals unreasonably applied <u>Strickland</u>.

### III. DISCUSSION

### A.      Failure to Object to Jury Instruction

Petitioner states that to be a party to the crime of delivering more than 40 grams of cocaine, he must have either intended to assist in the commission of such crime or such crime must have been a natural and probable consequence of a crime that he intended to assist. He contends that even if the jury found beyond a reasonable doubt that he intended to aid and abet Rodriguez, the jury should have been instructed to find him not guilty of aiding and abetting Rodriguez's delivery of cocaine unless it also found beyond a reasonable doubt that petitioner knew that Rodriguez intended to deliver more than 40 grams of cocaine, or that her delivery of more than 40 grams was a natural and probable consequence of the crime he intended to assist, delivery of an ounce. Petitioner argues that his trial counsel was ineffective for failing to object to the jury instructions, which did not contain such an instruction.

9

As explained below, petitioner's argument gets off on the wrong foot because the "crime" of which he was convicted was not the delivery of more than 40 grams of cocaine. Rather, he was convicted of the delivery of a controlled substance. That the controlled substance was cocaine and the amount delivered was 40 grams are facts that determine petitioner's penalty. Such facts are not elements of the crime. Further, under Wisconsin law, no specific mental state applies to the penalty factors. That is, the statutory maximum sentence for delivery of a controlled substance will be based on the type and amount of drugs delivered in fact, even if the defendant thought he was delivering (or aiding and abetting the delivery of) a smaller amount or a different type of controlled substance. Thus, under a proper understanding of Wisconsin law, the jury instructions were correct. The jury was not required to find that petitioner had the specific intent to aid and abet the delivery of a kilo of cocaine. Petitioner's trial counsel was therefore not ineffective for failing to object to the instructions.

### 1.    Wisconsin law concerning party to a crime liability.

Petitioner was convicted of intentionally aiding and abetting Rodriguez's delivery of cocaine to Officer Huerta. Party to a crime liability is governed by Wis. Stat. § 939.05, which provides as follows:

> Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it and although the person who directly committed it has not been convicted or has been convicted of some other degree of the crime or some other crime based on the same act.

In the present case, petitioner was charged as being "concerned in the commission of" Rodriguez's delivery of cocaine. Wis. Stat. § 939.05(2) determines when a person is

10

concerned in the commission of a crime:

> **(2)** A person is concerned in the commission of the crime if the person:
>
> (a) Directly commits the crime; or
>
> (b) Intentionally aids and abets the commission of it . . . .

Here, petitioner was charged under the aiding and abetting prong. The Wisconsin pattern jury instructions define "aiding and abetting" as follows:

> A person intentionally aids and abets the commission of a crime when, acting with knowledge or belief that another person is committing or intends to commit a crime, (he) (she) knowingly either:
>
> • assists the person who commits the crime; or
>
> • is ready and willing to assist and the person who commits the crime knows of the willingness to assist.
>
> To intentionally aid and abet <u>(name crime charged)</u>, the defendant must know that another person is committing or intends to commit the crime of <u>(name crime charged)</u> and have the purpose to assist the commission of that crime.

Wis. JI – Criminal § 405 (2005).

In the present case, the ultimate question for the jury was whether petitioner intentionally aided and abetted Rodriguez's alleged crime, delivery of a controlled substance. As explained in the next section, petitioner's argument that the jury was improperly instructed fails because petitioner misunderstands the elements of the "crime" that he was charged with aiding and abetting.

> **2.     Wisconsin law defining the "crime" of delivery of a controlled substance.**

Before the jury could find petitioner guilty of aiding and abetting the delivery of a controlled substance, the jury had to find beyond a reasonable doubt that Rodriguez

11

committed the crime of delivery of a controlled substance. The crime of delivery of a controlled substance is codified at Wis. Stat. § 961.41(1):

**(1) Manufacture, distribution or delivery.** Except as authorized by this chapter, it is unlawful for any person to manufacture, distribute or deliver a controlled substance or controlled substance analog.

The statute continues by defining the penalties for violating subsection (1), which vary depending on the specific controlled substance delivered and the amount of such substance delivered. In the present case, the relevant substance was cocaine, which meant that the penalty structure was as follows:

Any person who violates this subsection [i.e., subsection (1)] is subject to the following penalties:

. . . .

(cm) *Cocaine and cocaine base.* If the person violates this subsection with respect to cocaine or cocaine base, or a controlled substance analog of cocaine or cocaine base, and the amount manufactured, distributed, or delivered is:

1g. One gram or less, the person is guilty of a Class G felony.

. . . .

3. More than 15 grams but not more than 40 grams, the person is guilty of a Class D felony.

4. More than 40 grams, the person is guilty of a Class C felony.

Wis. Stat. § 961.41(1).[4]

---

[4]I list the penalties for less than 1 gram, 15 grams to 40 grams, and more than 40 grams because these were the amounts at issue in petitioner's trial. The sample in the five-dollar bill was less than 1 gram. Petitioner testified that he intended to deliver an ounce – i.e., 28 grams or between 15 and 40 grams. Finally, the jury found beyond a reasonable doubt that Rodriguez in fact delivered more than 40 grams (the kilo).

A crucial point is the distinction between the <u>elements</u> of the crime of delivery of a controlled substance and the <u>penalties</u> that can be imposed upon commission of the crime. Wisconsin has defined the crime of delivery of a controlled substance as having the following three elements: (1) The defendant delivered "a substance." (2) The substance was a controlled substance. (3) The defendant knew or believed that the substance was a controlled substance.[5] See Wis. JI – Criminal § 6020 (1999). Notably, a jury can find a defendant guilty of the crime of delivery of a controlled substance before it makes any findings concerning the identity of the controlled substance or the specific amount of the controlled substance delivered. These latter facts – identity of the substance and amount delivered – are facts that determine the penalty to be imposed upon a finding of guilt. Such facts have nothing to do with whether the defendant is guilty of the crime of delivery of a controlled substance in the first place.

The Wisconsin Supreme Court's decision in State v. Sartin explains that drug type and quantity are penalty factors rather than elements of the offense. In Sartin, the court held that "the only knowledge that the State must prove beyond a reasonable doubt in a possession[6] of a controlled substance case is the defendant's knowledge or belief that the substance was a controlled or prohibited substance." 200 Wis. 2d at 61. The facts of

_____

[5]Although the statute does not say that a defendant needs to know that the substance is a controlled substance in order to be guilty of its delivery, Wisconsin case law has interpreted the statute to include such a knowledge requirement. See State v. Sartin, 200 Wis. 2d 47 (1996); State v. Christel, 61 Wis. 2d 143 (1973); Wis. JI – Criminal § 6000 (1997).

[6]Although Sartin involved possession of a controlled substance rather than delivery of a controlled substance, the elements are the same except that, to be guilty of delivery, the defendant must deliver the substance rather than merely possess it.

13

Sartin involved a defendant who knowingly possessed a controlled substance, but did not know which controlled substance. The defendant thought he possessed either marijuana or cocaine. Id. at 50-51. Because the penalty for possession of cocaine was more severe than the penalty for possessing marijuana, the defendant argued that the state was required to prove that he knew that he possessed cocaine before he could be convicted of such possession. However, the supreme court rejected this argument, holding that "proof of the nature of the controlled substance is, in the statutory scheme, only material to the determination of the penalty to be applied upon conviction." Id. at 61.

Although the facts in Sartin involved the identity of the controlled substance rather than amount, Sartin's rationale applies with equal force to amount. In the course of its discussion, the Sartin court discussed analogous federal law governing knowledge of identity and quantity.[7] Id. at 62-64. The court stated as follows:

> Reviewing the content of the [federal] drug statutes involved, the court explained that they were primarily intended to prohibit importing or possessing a controlled substance. The subsequent penalty phase, an entirely separate component, only thereafter assigns the length of incarceration dependent upon the particular substance implicated. This characterization is consistent with the holding of other courts that the government is not required to prove the defendant's knowledge as to the specific amount of the substance possessed, despite the tremendous effect such amount can have on the penalty assessed.

Id. at 63 (emphasis added, citations omitted). The Wisconsin Supreme Court followed the approach of the federal courts. Id. at 63-64. It held that the requirement that a defendant know that he possessed illegal drugs was "designed to remove from the prosecution pool

_____

[7]Sartin recognized that the statutory design of Wisconsin's drug statutes parallels the design of federal drug statutes. 200 Wis. 2d at 63.

14

one who accidentally, innocently, or inadvertently possesses a controlled substance." Id. The court found that the policy behind this knowledge requirement did not require the state to also prove that the defendant knew which illegal drug he possessed. Id. The court reasoned that "one who knowingly engages in the trade of controlled substances should not profit by feigning ignorance, and subsequently relying on the State's potential inability to prove knowledge of the exact substance involved." Id. at 64. The same rationale applies to knowledge of the exact amount involved. One who knowingly engages in the drug trade but does not know the exact amount of drugs involved is not an innocent participant who needs to be removed from the prosecution pool.

Accordingly, under Wisconsin law, knowledge of the amount of controlled substance delivered is not an element of the offense of delivery of a controlled substance but a fact that determines penalty. See also United States v. Kelly, 519 F.3d 355, 363 (7th Cir. 2008) (holding that, under federal law, "[t]he particular type and amount of cocaine that a defendant possesses are not elements of the [possesion of a controlled substance] offense."); United States v. Gougis, 432 F.3d 735, 745 (7th Cir. 2005) (same); Knox v. United States, 400 F.3d 519, 523 (7th Cir. 2005) (same).

**3.    A defendant can intentionally aid and abet the delivery of a controlled substance without having knowledge of the specific amount delivered.**

Because the amount of cocaine that Rodriguez delivered was not an element of the crime that she was alleged to have committed, it was likewise not an element that the jury had to consider when determining whether petitioner intentionally aided and abetted Rodriguez's crime. One aids and abets crimes, not penalty factors. Here, the "crime" was simply delivery of a controlled substance, not delivery of more than 40 grams of cocaine.

15

Once the jury determined that Rodriguez knowingly delivered a controlled substance and that petitioner intentionally aided and abetted such delivery, petitioner was guilty of delivery of a controlled substance as party to the crime. Thus, petitioner's belief that the jury should have been instructed to find him guilty of aiding and abetting Rodriguez only if he knew that he was aiding and abetting the delivery of more than 40 grams of cocaine is erroneous. Cf. United States v. McNeese, 901 F.2d 585, 607-09 (7th Cir. 1990), overruled on other grounds, United States v. Westmoreland, 240 F.3d 618 (7th Cir. 2001) (holding that, as a matter of federal law, a defendant can be convicted of aiding and abetting possession of cocaine without proof that defendant had knowledge of the exact amount of cocaine possessed by third party).[8]

Petitioner argues that the United States Supreme Court's decision in Apprendi v. New Jersey, 530 U.S. 466 (2000), requires the state to prove all penalty factors beyond a reasonable doubt, and that therefore the jury should have been instructed to find petitioner guilty of delivery of a controlled substance as party to the crime only if it first found that petitioner had the specific intent to aid and abet the delivery of a kilo. Petitioner's argument, however, confuses a number of principles. First, while Apprendi does indeed require proof of all facts that increase the penalty for a crime beyond the prescribed maximum beyond a reasonable doubt, id. at 490, Apprendi does not require states to make all penalty factors elements of the offense. See United States v. Martin, 287 F.3d 609, 614-15 (7th Cir. 2002) (noting that although Apprendi makes penalty factors facts that the

---

[8]The Wisconsin Supreme Court cited McNeese with approval in Sartin. 200 Wis. 2d at 63.

16

government must specify and prove to a jury beyond a reasonable doubt, it does not rewrite or change the elements of an offense); United States v. Bjorkman, 270 F.3d 482, 490-92 (7th Cir. 2001) (same). As explained, in Wisconsin quantity is a penalty factor, not an element of the offense, and thus petitioner could aid and abet the delivery of a controlled substance without knowing the specific amount at issue.

Second, the penalty factor at issue in petitioner's trial was whether Rodriguez in fact delivered more than 40 grams of cocaine, not, as petitioner argues, whether petitioner knew that Rodriguez delivered more than 40 grams of cocaine. See United States v. Carrera, 259 F.3d 818, 830 (7th Cir. 2001) (rejecting argument that Apprendi requires proof of knowledge of type and amount of controlled substance involved in conspiracy before defendant can be convicted as co-conspirator and sentenced based on actual type and amount involved). Again, like federal law, Wisconsin law does not require proof of knowledge of type or quantity; rather, once a defendant is convicted of knowingly participating in the drug trade, the penalty range is determined by the type and amount actually delivered.

Third, as required by Apprendi, the jury at petitioner's trial was instructed to find all facts that determined petitioner's penalty beyond a reasonable doubt. Such facts were that Rodriguez delivered cocaine and that the quantity she delivered was more than 40 grams. Accordingly, there were no Apprendi violations at petitioner's trial.

**4.      Because the jury instructions correctly stated Wisconsin law, petitioner's counsel was not ineffective for failing to object to them.**

As explained above, the jury was not required to find beyond a reasonable doubt that petitioner knew that Rodriguez intended to deliver more than 40 grams of cocaine or

17

that delivery of more than 40 grams was a natural and probable consequence of the delivery of an ounce or less.  All that the jury had to find was that Rodriguez knowingly delivered a controlled substance, that petitioner intentionally aided and abetted such delivery, and that Rodriguez in fact delivered more than 40 grams of cocaine.  The jury instructions correctly stated these matters.   It follows that petitioner's counsel's failure to object to the instructions was not ineffective assistance, and that the state court of appeals thus did not render a decision that was contrary to or involve an unreasonable application of Strickland.

**B.     Failure to Object to Huerta's Testimony**

Petitioner next contends that his counsel was ineffective for failing to object to testimony by Officer Huerta, which petitioner asserts was speculative as to his intent.  On this issue, the court of appeals stated as follows:

> ¶ 21    Next, Hernandez argues that his attorney was ineffective because his performance was deficient for not objecting to what he terms "Officer Huerta's persistent and improper speculation regarding Hernandez's knowledge and intent." Again, we disagree. First, Huerta did not engage in "persistent and improper speculation" concerning Hernandez's involvement. Huerta purchased, in an undercover buy, a kilo of cocaine, so during trial it was proper to preface his comments using the term "kilo." The issue in the case was Hernandez's knowledge of the amount of the cocaine being purchased. Huerta believed Hernandez was the supplier of the cocaine, while Hernandez testified he was just asked to supply a sample of cocaine. Second, Hernandez's attorney established that the word "kilo" was never uttered during the taped conversation. His attorney was also successful in introducing other actions and statements that suggested Hernandez might not have been the cocaine supplier. Huerta was specifically asked:
>
> > [DEFENSE COUNSEL]: And Mr. Hernandez didn't talk about a kilo of cocaine, you did, didn't you?
> >
> > [OFFICER HUERTA]: I guess we both did, sir.  We were both talking about the same thing.

18

[DEFENSE COUNSEL]: Are you saying now that Mr. Hernandez used the word, kilo, on that tape?

[OFFICER HUERTA]: I never said that he used the word, kilo, and I discussed that yesterday.

The word, kilo, never came up as far as I was concerned.

[DEFENSE COUNSEL]: Well, you talked about a kilo of cocaine and the word didn't come up?

[OFFICER HUERTA]: Yes, that is correct.

[DEFENSE COUNSEL]: And now is it true that during the conversation, Erika Rodriguez also negotiated the deal with you and did she?

[OFFICER HUERTA]: She also did negotiate, yes.

[DEFENSE COUNSEL]: Okay.

And did she assure you that Angulo and her would be dealing with you from then on?

[OFFICER HUERTA]: I would - I would say, yes, yes, to that.

[DEFENSE COUNSEL]: And now, did you hear that on the tape when you listened to [Rodriguez] telling you that from that-telling you that Angulo and herself would be dealing with you from that point on?

Did you hear that on the tape?

[OFFICER HUERTA]: Yes, I did, sir.

That was towards the end of the conversation when I brought up the price of 26, she jumped in from the back seat and basically stopped me from talking to Hernandez, stating that, [she] would be dealing with [me] next time.

[DEFENSE COUNSEL]: On the tape, did you hear Mr. Hernandez say to you with the deal, you and me nothing?

[OFFICER HUERTA]: Yes, I heard him say that.

19

The jury was well aware of the fact that Hernandez denied he took part in any negotiations for a kilo of cocaine and that he contended that he only supplied a sample at Rodriguez's request. Thus, Hernandez's attorney attacked the officer's assumption that Hernandez had not only knowledge of the sale of a kilo, but also the intent to deliver the greater amount. Consequently, his attorney was not deficient. Because none of Hernandez's arguments alleging that his attorney's performance was deficient are successful, we need not address his grounds for why he was allegedly prejudiced, see Strickland, 466 U.S. at 697, and it therefore follows that his attorney did not provide ineffective assistance of counsel.

(Answer Ex. I.)

I cannot conclude that the court of appeals unreasonably applied Strickland. As the court explained, Huerta did not engage in "persistent and improper speculation" as to petitioner's intent but rather testified concerning his understanding of the words spoken by petitioner. Further, on cross-examination, petitioner's counsel got Huerta to admit that petitioner never used the word "kilo," and that Rodriguez used language to indicate that Huerta would be buying drugs from her, not petitioner. Thus, it is difficult to conclude that trial counsel's failure to object to Huerta's purported speculation was an error, much less that the state court unreasonably applied Strickland in concluding that, even it was an error, it was not an error that satisfied Strickland's deficient-performance prong.

## C.     Failure to Obtain Copy of Body-Wire Tape

Petitioner argues that his trial counsel was ineffective for failing to obtain a copy of the body-wire recording that Huerta made of his conversation with petitioner. On this question, the court of appeals ruled as follows:

¶ 17 Hernandez first argues that his attorney was ineffective because he failed to obtain a copy of the body wire tape of the conversation between Huerta, Hernandez and Rodriguez in Huerta's car. The record reflects that Hernandez's attorney did listen to the tape prior to trial and had asked for a

20

copy, but the State refused to make a duplicate of the tape. When the matter was brought to the trial court's attention, the trial court stated that it would have granted a motion seeking a copy of the tape, but no motion was ever filed. Hernandez now argues that his attorney's assistance was ineffective because his attorney's failure to bring such a motion constituted deficient performance. We disagree.

¶ 18 During the trial, the tape was played during Huerta's testimony. The court also ordered that the tape be stopped after each sentence in order for Hernandez's interpreter and the interpreter for the jury to explain what had just been said. While the better practice may have been to file a motion to obtain the tape prior to trial, Hernandez not only heard what was on the tape, but also had the benefit of the interpretation before he testified. In addition, Officer Huerta testified that the tape was only fifteen seconds long. Given the short duration of the tape, Hernandez had the opportunity to hear and absorb the entire conversation prior to his testifying. Consequently, Hernandez's attorney was not deficient for failing to bring a motion seeking a copy of the tape before trial.

(Answer Ex. I.)

I cannot conclude that the court of appeals's decision that petitioner's counsel was not deficient for not obtaining a copy of the tape and thereby permitting petitioner to hear it before trial was an unreasonable application of Strickland. Petitioner's counsel heard the tape himself, and the portion of the tape presented to the jury lasted only fifteen seconds. While I agree that it would have been preferable for petitioner's counsel to obtain the tape, the court of appeals's decision that counsel's failure did not rise to the level of violating Strickland's first prong was not unreasonable. Viewing the failure to obtain the tape as part of trial counsel's overall performance, I cannot conclude that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687.

Further, petitioner was not prejudiced.[9] It is not reasonably probable that if counsel

---

[9]The parties dispute whether the AEDPA heightened standard of review applies to my analysis of the prejudice prong, or whether my review is more analogous to a de novo

had obtained a copy of the tape and played it for petitioner before trial, the outcome of the case would have been different. When the tape was played during Huerta's testimony, a translator translated the entire conversation for petitioner. The tape was played sentence by sentence, phrase by phrase, with a stoppage after each so that petitioner could understand the conversation. Additionally, Huerta's testimony occurred one day before petitioner testified, so petitioner had the night to think about what was on the tape. Thus, petitioner was afforded the same opportunity that Huerta had – to listen, aided by a translator, to the body-wire recording before testifying. Moreover, during the trial, the judge informed petitioner that he could refresh his memory by listening to the tape again while testifying:

> If the defendant testifies, and if he wants to use the tape to refresh his recollection as to what was said, and he can certainly testify to the jury as to what he recalls what [sic] was said and he can use the tape to refresh his recollection if he needs to and we'll try to put it on the stand as close to him as possible so that the jury will not see that he's in custody.

(Answer Ex. 64 at 30.)

Accordingly, trial counsel's failure to obtain a copy of the body-wire tape did not deprive petitioner of the effective assistance of counsel.

_____

standard. I do not resolve this issue because, under either standard, I would conclude that petitioner did not suffer prejudice.

## IV. CONCLUSION

For the reasons stated, petitioner's application for a writ of habeas corpus is **DENIED**. The clerk of court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 12 day of August, 2008.

/s_____
LYNN ADELMAN
District Judge

23